JAMES A. CLARKSON [JUDGE RAKOFF stamp overlay]
Acting Regional Director
RICHARD PRIMOFF
Senior Trial Counsel
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281-1022
Tel.:    212-336-0148 (Primoff)
Fax:    212-336-1319
E-mail:  primoffr@sec.gov

**'09 CIV 00903**



[RECEIVED JAN 30 2009 U.S.D.C. S.D.N.Y. CASHIERS stamp]

UNITED STATES DISTRICT COURT
<u>SOUTHERN DISTRICT OF NEW YORK</u>

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. |
| Plaintiff, | 09 Civ. 903 - JSR |
| - against - | <u>COMPLAINT</u> |
| FOREST RESOURCES MANAGEMENT CORP., CHAIM JUSTMAN, WILLIAM J. REILLY, and PINCHUS GOLD, | |
| Defendants. | ECF CASE |

Plaintiff Securities and Exchange Commission, as and for its Complaint against defendants Forest Resources Management Corp. ("Forest"), Chaim Justman ("Justman"), William J. Reilly ("Reilly"), and Pinchus Gold ("Gold"), alleges as follows:

### PRELIMINARY STATEMENT

1.   This action arises out of a fraudulent scheme to violate the registration and antifraud provisions of the federal securities laws. Forest, Justman and Reilly, two of Forest's former officers, and Gold, Justman's business partner, reaped approximately $800,000 in unlawful profits by fraudulently procuring unlegended, purportedly free-trading shares of Forest stock, and then selling these shares to the investing public after Forest's false and misleading

material misrepresentations and omissions about its business operations artificially increased demand for that stock.

2.  Forest is and was a public shell company that at all relevant times had no income or assets. From June through October 2006, Reilly, Justman and Gold acted together to make material misrepresentations to Forest's transfer agent that provided false justification for the transfer agent to issue millions of restricted shares to Justman, Reilly, Gold, their nominees and others without the required restrictive legend. Justman, Reilly, Gold and their nominees were thus free to, and did, place these unlegended shares in brokerage accounts they controlled, and sold many of these shares in the open market, falsely holding them out to the public as free-trading shares, when in fact the shares were restricted stock. A registration statement was never in effect for these transactions in Forest's stock.

3.  From August through late November 2006, Justman, Reilly, and Gold sold more than a million shares of the improperly unlegended shares to the investing public, after Forest, Justman, and Reilly began issuing a series of false statements to the investing public regarding Forest's assets and commercial prospects. For example, Forest, through Justman and Reilly, misrepresented in a filing with the Commission and in press releases that Forest, based on a share exchange agreement that it had purportedly entered into with a company called Opus Management Group, Ltd. ("Opus"), held valuable timber properties in Central and South America. These statements were false because Forest had not entered into any signed agreement with Opus, and because Opus had no direct or indirect ownership of timber properties. During this period, Justman, Reilly and Gold realized a total of approximately $800,000 from their unregistered sales of Forest securities to the investing public.

4. Through this conduct, Forest, Justman, Reilly, and Gold violated the registration provisions and the antifraud provisions of the federal securities laws. Specifically, Forest, Justman, Reilly, and Gold sold unregistered securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a) and 77e(c), and Forest, Justman, Reilly, and Gold knowingly or recklessly made untrue statements of material fact, or failed to state material facts necessary in order the make the statements made, in light of the circumstances under which they were made, not misleading in connection with the purchase or sale of securities in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 77j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

5. The Commission seeks a judgment enjoining Forest, Justman, Reilly, and Gold from future violations of the federal securities laws, requiring Justman, Reilly, and Gold to disgorge their ill-gotten gains with prejudgment interest, ordering Justman, Reilly, and Gold to pay civil money penalties, barring Justman and Reilly from serving as an officer or director of any public company, and prohibiting Justman, Reilly, and Gold from participation in the offer or sale of any penny stock.

## JURISDICTION AND VENUE

6. The Commission brings this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act, 15 U.S.C. §§ 77t(b), 77t(d), and 77v(a), and Sections 21(d), 21(e), and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 78u(e), and 78aa. The Defendants, directly or indirectly, have made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, practices, and courses of business alleged in this Complaint.

7. This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 77aa.

8. Certain of the transactions, acts, practices, and courses of business alleged in this Complaint occurred within the Southern District of New York, including, but not limited to, telephone calls and e-mail messages concerning the transactions described herein.

## THE DEFENDANTS

9. **Forest** is a Delaware corporation with its principal offices located in New York, New York. Forest has no assets or operations.

10. **Justman**, age 28, was Forest's President and Chairman from July 3, 2006 until his resignation on November 30, 2006. Justman is a resident of Brooklyn, New York.

11. **Reilly**, age 54, was Forest's General Counsel, Secretary, and Director until January 2007. Reilly is licensed to practice law in New York, and maintains a law office in New York, New York. Reilly is a resident of Boca Raton, Florida.

12. **Gold**, age 40, was a business associate of Justman. Gold is a resident of Brooklyn, New York.

## FACTUAL ALLEGATIONS

### Defendants Fraudulently Procure Restricted Stock in Forest Without the Required Legend

13. In June 2006, Reilly controlled Forest (then known as Executive Hospitality Corp.), a publicly held shell company that had no income or assets.

14. At that time, Justman and Gold agreed to purchase control of Forest from Reilly.

15. To effect this transaction, Reilly agreed to cause Forest to issue to Gold and Justman and their nominees millions of restricted shares without the legend indicating that the shares were restricted (and additional shares that did bear the restrictive legend), in exchange for the payment of $27,500 to Reilly.

16. Reilly wrote several letters to Forest's transfer agent to achieve the issuance of unlegended shares to Justman, Gold, and their nominees, as well as to Reilly's nominees. Justman and Gold provided several representation letters to Forest's transfer agent purportedly pursuant to Securities Act Rule 144(k), 17 C.F.R. § 230.144(k) ("Rule 144(k) representation letters") to achieve such issuance of unlegended shares to Justman, Gold, and their nominees.

### June 21, 28, and 30, 2006 Letters

17. Reilly's first letter, dated June 21, 2006, instructed the transfer agent to issue 6.5 million unlegended shares to Gold. In this letter, Reilly stated that Forest had issued to "these Shareholders or their Assignors Convertible Term Notes which were convertible into the respective number of fully-paid and non-assessable Shares of Common Stock of the Issuer."

18. Reilly also stated in this letter that "with the applicable tacking period, the shares issuable upon this conversion have been held by the investors [sic], non-affiliates of the issuer, for a period in excess of two years." By this statement, Reilly informed Forest's transfer agent that (i) the transferor of the Convertible Term Notes was a non-affiliate of Forest and had held

the Convertible Term Notes for at least two years and (ii) the transferee of the Convertible Term Notes was a non-affiliate of Forest.

19. Reilly further stated in this letter that his assertions were based on and confirmed by a review of Forest's books and records.

20. Finally, Reilly stated that the holding period established by Rule 144(k) had been satisfied and that the 6.5 million shares issued to Gold should therefore bear no restrictive legend.

21. Reilly's second and third letters to Forest's transfer agent dated June 28 and 30, 2006, contained similar representations and instructed the transfer agent to issue a total of an additional 13 million shares not bearing a restrictive legend to Justman (6.5 million shares), and to Justman's and Gold's nominees (a total of 6.5 million shares).

22. Reilly's June 21, 28 and 30, 2006 letters contained materially false statements:

(a) These letters falsely indicated that Gold and Justman were not affiliates of Forest. In fact, Gold and Justman were affiliates of Forest when the unlegended shares were issued pursuant to these letters. Justman and Gold were control persons of Forest through their stock ownership and participation in corporate decisions, and Justman, between July 3 (when he first received his stock) and November 30, 2006, was Forest's president and chairman. Issuing these unlegended shares was an integral part of the transfer of control of the shell from Reilly to Justman and Gold.

(b) These letters falsely indicated that the transferor of the convertible term notes was not an affiliate of Forest and that the prior holders had not been affiliates of Forest. In fact, to the extent such notes even existed, Reilly owned them, directly or

through a nominee, and at all relevant times, Reilly was an affiliate of Forest because he was Forest's General Counsel, Secretary and Director.

(c) These letters falsely stated that Reilly's assertions were based on and confirmed by a review of Forest's books and records. In fact, Reilly had not reviewed Forest's books and records, and Reilly did not even know the location of Forest's books and records when he wrote these letters.

23. In connection with the issuance of the foregoing 19.5 million unlegended Forest shares to Justman, Gold, and their nominees, Reilly also prepared Rule 144(k) representation letters for signature by them.

24. Justman and Gold signed their own Rule 144(k) representation letters, and one of them signed a nominee's Rule 144(k) representation letter. These Rule 144(k) representation letters stated that each of the recipients of the unlegended stock received their interest in the convertible term notes as a gift from "Louis Gleckel" and that the recipients were not affiliates of Forest.

25. These statements in these Rule 144(k) representation letters were false because: (i) Justman and Gold received this stock by purchasing the shell company from Reilly; (ii) Justman and Gold were affiliates of Forest; and (iii) Reilly (or his nominee), not Gleckel, had been the holder of the convertible term notes, assuming such notes even existed.

26. Reilly knew that he, Justman, and Gold were affiliates of Forest and that he had not reviewed any books and records of Forest at the time he prepared and sent his June 21, 28 and 30, 2006 letters. Thus, Reilly knew his letters were materially false, or acted with reckless disregard for their truth or falsity.

27. Reilly, Justman, and Gold knew that Justman, Gold and their nominees received Forest stock due to Justman's and Gold's purchase of the Forest shell from Reilly and not as a gift from "Louis Gleckel." Reilly, Justman, and Gold also knew that Justman and Gold and their nominees were affiliates of Forest. Thus, Reilly, Justman, and Gold knew that the Rule 144(k) representation letters were materially false, or acted in reckless disregard for their truth or falsity.

28. The statements in Reilly's letters and in the Rule 144(k) representation letters were materially false and misleading, as they created the false factual justification for the transfer agent to treat the shares as having been held for a sufficient period by non-affiliates to qualify for an exemption from the registration provisions of the Securities Act, when in fact they did not qualify for an exemption.

29. The transfer agent, in response to Reilly's letters and accompanying Rule 144(k) representation letters, subsequently issued the requested 19.5 million shares to Justman, Gold, and Justman's and Gold's nominees on an unlegended, or "free-trading" basis, on or about July 3 and 5, 2006.

**July 16, 2006 Letter**

30. On July 16, 2006, Reilly wrote a letter to Forest's transfer agent requesting that it issue three million unlegended shares to Doylestown Partners Inc. At all relevant times, Doylestown was Reilly's nominee.

31. In Reilly's July 16, 2006 letter, Reilly stated that the shares issued to Doylestown should be unlegended because, in April 2003, a convertible term note was purportedly issued to Doylestown. Reilly's letter stated that Doylestown was not a Forest affiliate and that he had reviewed the books and records of Forest to confirm his statements.

32. These statements were false. Doylestown was a Forest affiliate because Doylestown was Reilly's nominee, and Reilly was Forest's General Counsel, Secretary and Director. Reilly had not reviewed Forest's books and records when he wrote this letter. At the time, Reilly knew his letter was materially false, or acted in reckless disregard for its truth or falsity.

33. The statements in this letter were materially false and misleading, as they created the false factual justification for the transfer agent to treat the shares as having been held for a sufficient period by non-affiliates to qualify for an exemption from the registration provisions of the Securities Act, when in fact they did not qualify for an exemption.

34. The transfer agent, in response to Reilly's July 16, 2006 letter, subsequently issued the requested three million shares to Doylestown on an unlegended, or "free-trading" basis, on or about July 18, 2006.

**August 9, 2006 Letter**

35. By August 9, 2006, Forest had effected a 100:1 reverse split in its stock to reduce the nominal amount of outstanding shares by a factor of 100.

36. On August 9, 2006, Reilly wrote another letter to Forest's transfer agent, requesting that the transfer agent issue a total of 5 million unlegended shares (equivalent to 500 million shares before the reverse split) to the following: 837,500 shares to Justman's wife, 837,500 shares to Gold, and the remaining shares to nominees of Michael Mitton, a recidivist securities violator who controlled Opus.

37. Reilly's letter stated that Justman's wife and Gold (along with two Mitton nominees) were receiving their shares as assignees of a convertible term note issued by Forest's corporate predecessor in 2003.

38. In connection with this request to issue Forest stock, Reilly prepared Rule 144(k) representation letters for signature by, among others, Justman's wife and Gold. Justman caused his wife's Rule 144(k) representation letter to be signed, and Gold signed his Rule 144(k) representation letter.

39. Reilly's August 9, 2006 letter and the Rule 144(k) representation letters stated that the recipients had received the stock as gifts and the source of the securities was a convertible term note purportedly issued to Shamrock Equities, Inc. At all relevant times, Shamrock was Reilly's nominee.

40. Reilly's letter and the accompanying Rule 144(k) representation letters also stated that Shamrock, Justman's wife, and Gold were not affiliates of Forest.

41. Reilly further stated in this letter that his assertions were based on and confirmed by a review of Forest's books and records.

42. Reilly's August 9, 2006 letter was materially false. First, Shamrock, Justman's wife and Gold were affiliates of Forest. Second, these shareholders acquired their interest from Reilly, who at the time of acquisition was the company's General Counsel, Secretary and Director. Third, Reilly had not reviewed any of Forest's books and records, to the extent they existed.

43. The Rule 144(k) representation letters were materially false because Justman's wife and Gold did not receive this stock as a gift, and Shamrock, a corporation controlled by Reilly, was a Forest affiliate. The Rule 144(k) representation letters were also false because Justman's wife and Gold were Forest affiliates.

44. Reilly knew that he, Justman's wife and Gold were affiliates of Forest and that Reilly had not reviewed any books and records of Forest at the time he prepared and sent his

August 9, 2006 letter. Thus, Reilly knew his letter was materially false, or acted with reckless disregard for its truth or falsity.

45. Reilly, Justman, and Gold knew that Justman's wife and Gold received Forest stock due to Justman's and Gold's purchase of the Forest shell from Reilly and not as a gift from Shamrock. Reilly, Justman, and Gold also knew that Reilly, Justman's wife, and Gold were affiliates of Forest. Thus, Reilly, Justman, and Gold knew that the Rule 144(k) representation letters were materially false, or acted in reckless disregard for their truth or falsity.

46. The statements in Reilly's letters and in the Rule 144(k) representation letters were materially false and misleading, as they created the false factual justification for the transfer agent to treat the shares as having been held for a sufficient period by non-affiliates to qualify for an exemption from the registration provisions of the Securities Act, when in fact they did not qualify for an exemption.

47. The transfer agent, in response to Reilly's August 9, 2006 letter and accompanying Rule 144(k) representation letters, subsequently issued the requested 837,500 shares each to Justman's wife and Gold on an unlegended, or "free-trading" basis.

**October 11, 2006 Letter**

48. On October 11, 2006, Reilly wrote a letter to Forest's transfer agent requesting that the transfer agent issue 200,000 shares to an associate of Gold and 232,500 shares to a "Pinchus Justman." "Pinchus Justman" is a fictitious name using Gold's first name and Justman's last name. Reilly's letter stated that Gold's associate and "Pinchus Justman" were receiving their shares as assignees of a convertible note. Reilly's letter also stated that his assertions were based on and confirmed by a review of Forest's books and records.

49. In connection with this request to issue Forest stock, Reilly prepared Rule 144(k) representation letters, which were purportedly signed by Gold's associate and "Pinchus Justman." Justman and/or Gold caused these Rule 144(k) representation letters to be signed.

50. The Rule 144(k) representation letters contained blanks and did not provide any information regarding how Gold's associate or "Pinchus Justman" obtained these securities.

51. Reilly's October 11, 2006 letter was materially false and misleading. First, "Pinchus Justman" is a fictitious name. Second, the stock issued to "Pinchus Justman" was beneficially owned by Justman or Gold. Third, the Forest stock issued to "Pinchus Justman" was acquired directly from Reilly, a Forest affiliate. Fourth, Reilly had not reviewed any of Forest's books and records, to the extent they existed.

52. The Rule 144(k) representation letters that accompanied the Reilly's October 11, 2006 letter were materially false and misleading because: (i) the letter purportedly signed by "Pinchus Justman" did not disclose that that person was fictitious; and (ii) the letters did not disclose that the stock was obtained from Reilly as part of the sale of Forest to Justman and Reilly.

53. Reilly knew that his October 11, 2006 letter was materially false, or acted with reckless disregard for its truth or falsity.

54. Reilly, Justman, and Gold knew that the Rule 144(k) representation letters accompanying Reilly's October 11, 2006 letter were materially false, or acted in reckless disregard for their truth or falsity.

55. The statements in Reilly's letters and in the Rule 144(k) representation letters were materially false and misleading, as they created the false factual justification for the transfer agent to treat the shares as having been held for a sufficient period by non-affiliates to qualify for

an exemption from the registration provisions of the Securities Act, when in fact they did not qualify for an exemption.

57. The transfer agent, in response to Reilly's letters and accompanying Rule 144(k) representation letters, subsequently issued the requested shares on an unlegended, or "free-trading" basis.

**October 23, 2006 Letter**

57. On October 23, 2006, Reilly wrote a letter to the transfer agent directing the issuance of 400,000 unlegended Forest shares to Shamrock, which was Reilly's nominee. Reilly enclosed with the letter a resolution from the board of directors stating:

> At a special meeting of the board of directors of Forest Management Resources Corp., held at Boca Raton, FL on the 25th day of October 2006, a quorum of Directors present either in person or telephonically, the following resolution was duly proposed and unanimously adopted:
>
> Upon motion of Chaim Justman, President, and duly seconded, it was
>
> Resolved, that the corporation shall be authorized to issue 750,000 shares of common stock in exchange for the conversion of a . . . convertible promissory note . . . assigned to Shamrock Equities, Inc. . . .

58. Reilly signed the board resolution, dated October 25, 2006, as Forest's Secretary. The transfer agent issued the requested 400,000 (post-reverse split) shares to Reilly's nominee on October 23, 2006.

59. Reilly's representation that Forest had approved the stock issuance, however, was false because Forest did not in fact authorize the issuance of this stock. Rather, Reilly falsified Forest's corporate records and provided the falsified records to the transfer agent with his October 23, 2006 letter.

## Defendants Materially Misrepresent Forests' Assets While Making Unregistered Sales of their Stock to the Investing Public

60. Beginning in August 2006, and continuing through late November 2006, Forest, Justman, and Reilly continued their fraudulent scheme by preparing and disseminating a series of false and misleading public statements, designed to drive up the trading price and volume of Forest's stock, and afford Justman, Reilly, and Gold the opportunity to profit by selling their unregistered Forest stock to the public.

61. On August 9, 2006, Forest filed a Form 8-K with the Commission announcing a purported transaction with Opus, a company Mitton controlled. Reilly prepared this Form 8-K filing, and Justman signed it.

62. Forest issued the August 9, 2006 Form 8-K which stated:

> On August 7, 2006, [Forest] entered into a Share Exchange Agreement with Opus Asset Management Group, Inc. ... Opus, through its Valcor Holding, Inc. subsidiary, is a forest management and logging company with extensive property rights to forestland located in Nicaragua, which after Brazil has the largest rain forests in the Western Hemisphere. These forests are primarily comprised of rare and exotic hardwood growths such as mahogany and rosewood.
>
> Valcor's goal is to become Central and South America's leading producer of high-quality, environmentally sustainable forest products. The Company plans to accomplish this objective by combining its existing cutting, milling, and logistic operations with an aggressive reforestation program calculated not just to preserve but to improve its vital natural resource base.

63. The statements in the August 9, 2006 Form 8-K were materially false. As of August 9, 2006, Opus and Forest had not entered into a final share exchange agreement, and Reilly and Justman were aware of that fact. Furthermore, Valcor was not a subsidiary of Opus. Opus did not own or control any part of Valcor. Opus never had any relationship whatsoever with Valcor, or any right to any of its assets.

64      Beginning on September 5, 2006, Forest issued a series of press releases that continued to misrepresent Forest's assets and prospects to the investing public, in a manner consistent with the false and misleading August 9, 2006 Form 8-K.

65.     The press releases claimed that Opus (which Forest had represented falsely as having merged with Forest) owned and operated a forest management and logging company "through its Valcor Holdings Inc. subsidiary."

66.     Justman authorized the issuance of the following press releases:

- September 5 press release stated that Opus acquired over 1.5 million acres of property in Central and South America, including timber and mineral rights with an estimated value in excess of $500 million.

- September 7 press release stated that Opus had commenced operations in February 2006 and generated $27 million in gross revenues in its first quarter.

- September 21 press release stated that Opus had received $26 million in orders from two major flooring companies.

- October 13 press release stated that Forest had entered into an agreement valued at $19.5 million with a major heavy equipment manufacturer to supply equipment to its South American properties.

- October 17 press release stated that Forest had commenced construction to double the size of its mill facility at its South American plant.

- November 21 press release stated that Opus had signed a two year contract for $42.5 million with a major North American distributor.

67      The foregoing representations in the press releases were materially false, as they touted valuable assets and commercial prospects that Forest did not own, directly or indirectly.

68.     Forest, Justman and Reilly knew that the August 9, 2006 Form 8-K and Forest and Justman knew that the press releases were materially false and misleading, or acted in reckless disregard of their truth or falsity.

69. Specifically, Forest, Justman, and Reilly knew that Forest had not entered into a final share exchange agreement with Opus. In addition, before they filed their August 9, 2006 Form 8-K and issued their press releases, Forest, Justman and Reilly had never received any information supporting any claim by Opus to ownership of Valcor, apart from an oral representation by Mitton, who controlled Opus. Forest, Justman and Reilly never met with or spoke with any representative of Valcor. Indeed, Forest, Justman and Reilly requested documentation from Mitton supporting his claim that Opus owned Valcor before they made their statements to the public, but never received any documentation. Notwithstanding Mitton's failure to respond to their requests for documentation supporting his claims, Forest, Justman, and Reilly undertook no other effort to ascertain the truth of the claims before holding them out to the investing public as being true, through Forest's August 9, 2006 Form 8-K, and their series of false press releases.

## Justman, Reilly, and Gold Profit from the Sale of Forest Securities to the Investing Public

70. While Forest falsely touted its purported ownership of Valcor to the investing public, the price of Forest common stock more than tripled, from a closing price of $0.25 per share on September 5, 2006 to a closing price of $0.95 per share on September 7, 2006. On September 19, 2006, Forest's stock price reached a closing high of $1.08 per share. Forest's stock price also spiked upwards following the releases of each of Forest's October 13, October 17, and November 21 press releases. The trading volumes substantially fell after December 1, 2006.

71. On January 16, 2007, the Commission issued a ten-day trading suspension of Forest securities. After the trading suspension, Forest's stock price fell to $0.05 per share.

72. Between September and December 2006, Justman, Gold, and Reilly, directly and through their relatives and nominees, sold substantial amounts of Forest common stock to investors. Justman, Reilly, and Gold received $110,606.20, $88,002.28, and $598,976.47, respectively, from these sales.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

73. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 72 of this Complaint.

74. From at least August 2006 through at least December 2006, Forest, Reilly, Justman, and Gold, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities issued by Forest, have:

   (a) employed devices, schemes, and artifices to defraud;

   (b) made untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

   (c) engaged in transactions, acts, practices, and courses of business which operated as a fraud or deceit upon purchasers of securities issued by Forest.

75. Forest, Reilly, Justman, and Gold engaged in the above conduct knowingly or recklessly.

76. By reason of the foregoing, Forest, Reilly, Justman, and Gold, directly or indirectly, singly or in concert, have violated and unless enjoined will continue to violate Section

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

77. The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 72 of this Complaint.

78. The Forest stock that Forest, Reilly, Justman, and Gold have offered and sold to the investing public as alleged herein constitute "securities" as defined by Section 2(a)(1) of the Securities Act, 15 U.S.C. § 77b(a)(1), and Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10).

79. Forest, Reilly, Justman, and Gold, directly or indirectly, singly or in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or the mails, to offer and sell securities through the medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption from registration was available.

80. By reason thereof, Forest, Reilly, Justman, and Gold have violated and unless enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

## PRAYER FOR RELIEF

**WHEREFORE** the Commission respectfully requests that the Court grant the following relief:

**I.**

A final judgment permanently restraining and enjoining Forest, Reilly, Justman, and Gold, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**II.**

A final judgment permanently restraining and enjoining Forest, Reilly, Justman, and Gold, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c).

**III.**

A final judgment ordering Justman, Reilly, and Gold to disgorge their ill-gotten gains, plus prejudgment interest, and such other and further amount as the Court may find appropriate.

**IV.**

A final judgment ordering Reilly, Justman, and Gold to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

**V.**

A final judgment enjoining and restraining Reilly, Justman, and Gold from participating in the offering of any penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

## VI.

A final judgment barring Reilly and Justman from serving as an officer or director of any public pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2).

## VII.

Such other and further relief as the Court deems appropriate.

Dated:    New York, New York
          January 29, 2009

*James A. Clarkson*
JAMES A. CLARKSON
Acting Regional Director
RICHARD PRIMOFF
Senior Trial Counsel
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281-1022
Tel.:      212-336-0148 (Primoff)
Fax:       212-336-1319
E-mail:    primoffr@sec.gov

Of Counsel:
Gerald A. Gross
John J. Graubard
Kay Lackey (not admitted in SDNY)